Good morning again. May it please the court. This case involves a very different issue. The primary issue in this case is that the ALJ found that the claimant is credible and that the claimant's father is credible, provided no reasons for rejecting their testimony. He did say that he didn't accept the claimant's conclusion of disability. That's a legal matter, whether or not someone is, quote, disabled. That's a term of art reserved to the Social Security Administration. But other than that, the ALJ said that the claimant and the father are credible. So what we look at is what did the claimant and what did the claimant's father identify as impairments and limitations experienced by the claimant. The claimant himself said that he is easily sidetracked and works at a slow pace. The father testified that he's easily distracted and thus cannot carry out even simple instructions. He can understand them, but he can't carry them out. He cannot maintain attention and concentration for extended periods, and he cannot perform activities reliably within a schedule. He couldn't work with other people in the same room due to the distraction factor. The ALJ gave no reasons for rejecting these assessments. So what we do is we look at the ALJ's hypothetical. Does it account for these limitations? And it does not. The ALJ does not say that he can't work with other people in the room. It doesn't say that he is unable to sustain a schedule. So when he was for 15 years running his newspaper route, he didn't have other people in the room and he got along fine. Well, he's not actually in a room. And the testimony was that he really didn't perform that job the way that it was expected to be performed. He would be late in delivering the papers, for example. And that's actually a pretty minimal level of activity. It never rose to the level of substantial gainful activity, which is considered under the act. Was he ever self-supporting at all in any way? No. At the time, I think he was 33 years old. What did he do for the 20 years after, well, after he was in high school? He lived with his parents and had a newspaper route. And that was about it. He actually lived kind of a childlike or teenagerlike existence, I guess. Didn't the vocational expert say there were still jobs in the economy that he could do, even though he had these problems with attention span and working with other people? Well, that's a critical issue, Your Honor, because in response to the ALJ's hypothetical, which didn't include these impairments, which I just recited, the V.E. did say. Isn't one problem that at least some of the things the father said, while they may have been true, wouldn't necessarily link up to any impairment? I mean, a lot of people may not get to work in the morning. It isn't necessarily because they're impaired. Well, that is true, Your Honor. If that were, in fact, the case and that these had nothing to do with any impairment, then, you know, if he just liked to sleep in, then that's not an impairment. All I'm saying is the doctor, the father was making observations about his son's behavior. But the observations about the son's behavior don't necessarily. He was not making observations. He probably isn't qualified to make observations about whether those that behavior was caused by his impairments. Well, yes and no. He was making observations. I'm not suggesting that the father has medical expertise. But under the Dodrell case and Sprague, Sprague v. Vaughan, some of the other cases cited in our briefs, this court has recognized that once you have a medically determinable impairment in existence, lay witnesses such as the family members are particularly qualified to tell the ALJ precisely how those medically determinable impairments do affect. But that's understandable and sensible when you're dealing with physical impairments. When you're dealing with mental impairments and when it's very difficult to sort out mental impairments and character, it's really not. It is. Why somebody's observations about how you behave is an observation about your impairment. Well, I think that over a period of 33 years, well, let's say 15 years since he reached adulthood, that these types of behaviors, the inability to adhere to any kind of a schedule and be reliable, that kind of thing, those may, I think, be observed by a lay witness and reliably tied to a mental impairment, even though the lay witness doesn't know what mental impairment it is that's causing them. Because as the agency recognizes, even a personality disorder, which most people kind of think of as just a characterological thing, but the agency recognizes that even a personality disorder is a mental impairment which can be disabling under the act. And so when you have a 15-year pattern of this same activity, I think that the lay witness can be qualified to tie this to a mental impairment rather than simply volition or lack of volition on the part of the claimant. But anyhow, as Judge Goodwin was getting to, the V.E. did testify that assuming only that part of the impairments in the ALJ's hypothetical, the claimant could do some jobs like small products assembly and cafeteria attendance. But then the claimant's representative added those elements which were in the testimony, that he has difficulty adapting, that he can't perform activities within a schedule and would be distracted by working around others. And the V.E. then testified that the jobs he had identified would be inappropriate because those types of limitations would eliminate the ability to perform those jobs. You also identified, as I remember, another problem, which was that the judge didn't ask for a medical assessment of what his residual ability was. Right. Can you just clarify that issue a bit? Well, the agency's regulations require that an ALJ at least ask. That's 404.15.13.V.6. The regulation also says that the lack of a statement won't make the report incomplete. All right. So here then, you didn't ask and he didn't get. But if he did ask and didn't get, it wouldn't have mattered. Then I would have no argument. All right. So I guess what I'm interested in knowing is what then would be the prejudice in not asking and not getting. Well, because by not asking, we don't know what the limitations would have been. If he did ask and didn't get, he still wouldn't have. That is true. But if the doctor had refused, we can't blame it on the ALJ. But if the ALJ refused, we can blame it on the ALJ. And it's my position that that is a basis for this court to remand the case back and tell the ALJ, please ask the doctor what the medical limitations are. I'd like to reserve the last few seconds.  My name is David Burdette on behalf of the Commissioner. I'd like to respond first to the last point on 404.15.13 and the duty to ask. And as the panel indicated, it's quite correct that there's no actual prejudice because the lack of an asking, even if the report had been asked for and not given, the regulation states clearly that that does not make the record incomplete. And in addition to that, we have 20 CFR 404.15.12, I think they have to be interpreted together, where it says that the record has to be requested where the evidence, not just the medical evidence, but the whole evidence is sufficiently ambiguous as to make it necessary to search for more medical, for further medical reports to determine the issue of disability or non-disability. And I don't think that was necessary in this case. Now, on the issue of the credibility of the witnesses, we certainly have no problem with finding the witnesses credible and accepting their testimony generally as credible. That doesn't mean that all of their conclusions about disability are to be accepted. A person can be a credible lay witness and not lying and accurately reporting their observations of what has gone on over a period of years. But that doesn't mean that those observations link up with any particular impairment. Observations of behavior, observations of what has happened as a matter of fact, that doesn't mean that they know what the causation of certain patterns of behavior is. You look like you're about to ask me a question on that. Okay. And the third issue is with regard to the hypotheticals that were posed to the VE. And there's sort of a colloquy between first the ALJ and the VE and then the Plaintiff's Counsel and the VE that goes on over about five pages, and I think it's 45 through 50 of the excerpts. I believe that the ALJ asked the VE a question assigning moderate limitations in the ability to maintain one's attention and moderate limitations in the ability to maintain concentration, which is very much the same thing. And I believe that that is an adequate and acceptable capitulation. Except that the VE apparently didn't understand it that way because when she was then later asked what if he had problems keeping pace, she said, oh, that would be a problem, indeed it obviously would be a problem with regard to an assembler. So when she was talking, thinking of moderate impairment and concentration, she probably, apparently wasn't thinking of a pace problem. It would be a problem with the assembler, which presumably is a person who has to do things as units are coming down the line or whatever. I don't think it would be a problem. No, but my point is that the general way in which the statement lack of concentration was put to her apparently did not translate to her as a pace problem because then when she was specifically asked what about the pace problems, she said, oh, that would be different. So in an attempt to say that if you regard the father's report as material that should have been included, she obviously did not understand it to be included. The VE did not. But I think that even including that, you have, the VE says, okay, that's a problem with regard to the small products assembler. You have 200,000 other jobs that are available as cafeteria assistants, I think the name of it. And then the plaintiff's attorney and the VE went back and forth on that. And there's some resistance on the part of the VE, if you look at the record, to the idea that such a person, a hypothetical person like the claimant, would not be able to perform the job of cafeteria attendant. And ultimately the plaintiff's attorney says, well, what if, or what's the effect? I don't want to exactly misrepresent it. It might make the person forget what they're doing and just watching other people. Right. And then she said that would be a definite problem. Right.  necessarily supports that every time this person is hypothetically working in a cafeteria, that every time someone comes across the screen of his field of vision, that he's going to drop what he's doing and look up. I think that it was perfectly fair for the ALJ to not assume that that would happen. And I think basically that that is the point of the case. And may I answer any further questions? That's fine.  Thank you, Your Honor. That is the point of the case. And the point of the case is that the ALJ didn't have to find that this distraction would occur every time somebody crossed this claimant's field of view. But they did not reasonably have found that it would never happen and wouldn't mess up his ability to sustain work. What did the father say exactly that was pertinent to the distraction issue? He testified that the claimant is easily distracted and cannot carry out even simple instructions. And he also testified that he couldn't work with other people in the same room. That would be at, let's see, excerpts page 39, I believe is where that testimony was. How would the father know that if he hadn't actually worked for 20 years? Well, he had seen him engage in other work-like activities such as. But then he's making a conclusion about disability, right? It's not an observation. In other words, if this is an extrapolation, then it's really not an eyewitness report, an observation. Well, you have, like, the thing about short and simple instructions. And the father says, yeah, I think so. He could remember those. But would he be able to carry them out? No. He'd understand them, but whether or not he carried them out, he might get distracted. Okay. Your time's up. Thank you very much. Thank you. Welcome to your argument. The case of Scherchel v. Barnhart is submitted.
judges: Goodwin, Hug, Berzon